ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| JESÚS R. DÍAZ GONZÁLEZ<br>Recurrente<br><br>v.<br><br>OFICINA PARA LA REGLAMENTACIÓN DE LA INDUSTRIA LECHERA DE PUERTO RICO<br>Recurrida | KLRA202400355 | *REVISIÓN ADMINISTRATIVA* procedente de la Oficina de Reglamentación de la Industria Lechera<br><br>Querella Núm.: 22-009<br><br>Sobre: DECOMISO DE LECHE |

Panel integrado por su presidenta, la Juez Brignoni Mártir, el Juez Candelaria Rosa, la Jueza Álvarez Esnard y la Jueza Díaz Rivera.

Díaz Rivera, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de agosto de 2024.

Comparece ante *nos*, Jesús R. Díaz González (Díaz González o recurrente) y nos solicita que revisemos la *Resolución y Orden Final* emitida el 5 de junio de 2024, por la Oficina para la Reglamentación de la Industria Lechera de Puerto Rico (ORIL o recurrida). Dicha *Resolución y Orden Final* fue notificada a las partes el 6 de junio de 2024. Mediante dicho dictamen, se declaró *Ha Lugar* la *Contestación a la Querella, Defensas Afirmativas y Moción de Desestimación* que presentó la parte recurrida y, en consecuencia, se desestimó la *Querella* que presentó la parte recurrente.

Por los fundamentos que expondremos a continuación, se *revoca* el dictamen recurrido.

**I.**

El 12 de abril de 2022, la ORIL emitió una *Orden RE: Cobro por Contaminación de Leche en Tanque Termo* en contra de Díaz González. En esta, explicó que la producción de leche cruda de su vaquería incumplió con un parámetro de conteo bacteriano y que la misma fue decomisada. Indicó, además, que se decomisó veintitrés

Número Identificador

SEN2024_____

mil doce (23,012) cuartillos de leche cruda de los cuales tres mil seiscientos cuarenta y dos (3,642) pertenecen al recurrente y diecinueve mil trescientos setenta (19,370) cuartillos pertenecen a otros ganaderos. Consecuentemente, ordenó al recurrente el pago de diecisiete mil treinta y seis con noventa ($17,036.90) correspondientes a la leche decomisada con bacteria contenida en el tanque T-39 de la Vaquería Tres Monjitas, Inc.

Oportunamente, el 10 de mayo de 2022, Díaz González presentó una *Querella* ante la ORIL mediante la cual impugnó la *Orden RE: Cobro por Contaminación de Leche en Tanque Termo* y solicitó una Vista Administrativa. El 29 de julio de 2022, la parte recurrida presentó una *Contestación a la Querella, Defensas Afirmativas y Moción de Desestimación*. Acto seguido, el 12 de agosto de 2022, el Oficial Examinador emitió una *Orden* mediante la cual concedió un término de veinte (20) días al recurrente para que mostrara causa por la cual la *Querella* no debía ser desestimada.

En respuesta, el 29 de agosto de 2022, el recurrente presentó una *Oposición a Moción de Desestimación*. Entretanto, el 5 de junio de 2024, la ORIL emitió una *Resolución y Orden Final* mediante la cual declaró *Ha Lugar* la *Contestación a la Querella, Defensas Afirmativas y Moción de Desestimación* que presentó la parte recurrida y, en consecuencia, desestimó la *Querella* que presentó la parte recurrente.

Insatisfecho con esa determinación, el 8 de julio de 2024, la parte recurrente presentó una *Solicitud Revisión [sic] por el Tribunal de Apelaciones de Decisión de la Oficina para la Reglamentación de la Industria Lechera* y alegó la comisión de los siguientes errores:

A. Erró la Oficina Para la Reglamentación de la Industria Lechera Para Puerto Rico (ORIL) al Declarar Ha Lugar la Moción de Desestimación presentada por ORIL y en su consecuencia desestimar la Querella 22-009, ya que la ORIL incumplió con el debido proceso de ley del

Querellante-Recurrente cuando no aplicó correctamente las disposiciones del Reglamento 8889 del 27 de enero de 2017.

B. Es arbitraria y caprichosa la decisión de ORIL en la Querella 22-009, fundamentada en la Resolución y Orden Final del 6 de junio de 2024 donde ORIL aplicó una disposición reglamentaria sobre "adulterantes e inhibidores en la leche cruda" por analogía a la situación de la Querella 22-009 que versa sobre bacterias y límite de celular somáticas, lo anterior cuando el Reglamento 8889 del 27 de enero de 2017 contiene penalidades específicas para el caso de bacterias y límite de células somáticas.

C. Erró la Oficina Para la Reglamentación de la Industria Lechera Para Puerto Rico (ORIL) cuando aplicó las disposiciones sobre "adulterantes e inhibidores en la leche cruda" del Reglamento 8889 del 27 de enero de 2017 a hechos que versan sobre "conteo de bacterias y límite de células somáticas", aun cuando dicho reglamento ya contiene penalidades y procesos específicos para el caso de bacterias y límite de células somáticas, lo anterior creando una penalidad que no está contenida en el Reglamento 8889.

D. Erró la Oficina Para la Reglamentación de la Industria Lechera Para Puerto Rico (ORIL) cuando creó una Regla Legislativa que crea una consecuencia punitiva por analogía, basada en una *"Notificación a los Productores de Leche Licenciados por la ORIL y Sujetos al reglamento Núm. 5 de la ORIL"* la cual fue firmada y enviada por el director de Programa de Calidad de ORIL, quien no es Administrador de ORIL, y ni siquiera es empleado de dicha agencia.

Examinada la *Solicitud Revisión [sic] por el Tribunal de Apelaciones de Decisión de la Oficina para la Reglamentación de la Industria Lechera,* este Tribunal emitió una *Resolución* el 16 de julio de 2024, concediéndole un término de veinte (20) días a la parte recurrida para que expresara su posición al recurso. El 5 de agosto de 2024, la parte recurrida presentó el *Alegato de la Recurrida Oficina de Reglamentación de la Industria Lechera de Puerto Rico.* Con el beneficio de la comparecencia de todas las partes, procedemos a resolver.

**II.**

**A. Revisión judicial de determinaciones administrativas**

La Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, según enmendada, (3 LPRA sec. 9601 *et seq.*) (LPAU), se creó a los fines de uniformar los procedimientos administrativos ante las agencias. Consecuentemente, desde la aprobación del procedimiento provisto por la LPAU, los entes administrativos están precisados a conducir sus procesos de reglamentación, adjudicación y concesión de licencias y permisos de conformidad con los preceptos de este estatuto y el debido proceso de ley. *López Rivera v. Adm. de Corrección,* 174 DPR 247, 254-255 (2008).

La Sección 4.1 de la LPAU, dispone que las decisiones administrativas finales pueden ser revisadas por el Tribunal de Apelaciones. (3 LPRA sec. 9671). La finalidad de esta disposición es delimitar la discreción de los organismos administrativos para asegurar que estos ejerzan sus funciones conforme a la ley y de forma razonable. *Simpson y otros v. Consejo de Titulares y otros,* 2024 TSPR 64, 213 ___ (2024). Véase, además, *Capó Cruz v. Jta. de Planificación et al.,* 204 DPR 581, 590-592 (2020); *Empresas Ferrer, v. ARPe,* 172 DPR 254, 264 (2007). Es decir, la revisión judicial permite a los tribunales garantizar que las agencias administrativas actúen dentro de los márgenes de las facultades que le fueron delegadas por ley. *Capote Rivera y otros v. Voilí Voilá Corp. y otros,* 2024 TSPR 29, 213 DPR ___ (2024). A su vez, posibilita el poder constatar que los organismos administrativos "cumplan con los mandatos constitucionales que rigen el ejercicio de su función, especialmente con los requisitos del debido proceso de ley". Íd. Así, la revisión judicial constituye el recurso exclusivo para revisar los méritos de una decisión administrativa sea esta de naturaleza

adjudicativa o de naturaleza informal. *Capote Rivera y otros v. Voilí Voilá Corp. y otros, supra*; *Depto. Educ. v. Sindicato Puertorriqueño,* 168 DPR 527 (2006).

Es norma reiterada que las decisiones de los organismos administrativos están revestidas de una presunción de regularidad y corrección, *OCS v. CODEPOLA,* 202 DPR 842, 852-853 (2019). Esto debido a que, mediante esta norma se reconoce el peritaje del que gozan los organismos administrativos en aquellas materias que le han sido delegadas por ley. *OCS v. Universal,* 187 DPR 164, 178 (2012); *The Sembler Co. v. Mun. de Carolina,* 185 DPR 800, 821 (2012).

Nuestro máximo Foro ha establecido que, al ejercer la revisión judicial los tribunales no pueden descartar de forma absoluta la determinación de una agencia, sino que primero tienen que examinar la totalidad del expediente y determinar si la interpretación de la agencia representó un ejercicio razonable de su discreción administrativa, así fundamentado en la pericia particular de esta, en consideraciones de política pública o en la apreciación de la prueba. *Capote Rivera y otros v. Voilí Voilá Corp. y otros*, *supra; Otero v. Toyota,* 163 DPR 716 (2005).

Cónsono con lo anterior, la sección 4.5 de la LPAU establece que los tribunales deben sostener las determinaciones de hechos de las agencias si están basadas en "evidencia sustancial que obra en el expediente administrativo". (3 LPRA sec. 9675). Como vemos, la norma anterior nunca ha pretendido ser absoluta. Por eso, el Tribunal Supremo ha resuelto con igual firmeza que los tribunales no pueden extender un sello de corrección, so pretexto de deferencia, a las determinaciones o interpretaciones administrativas irrazonables, ilegales, o simplemente, contrarias a derecho. *Super Asphalt v. AFI y otro* 206 DPR 803, 819 (2021); *Graciani Rodríguez v. Garage Isla Verde,* 202 DPR 117, 127 (2019).

Sin embargo, la citada Sección 4.5 de la LPAU, *supra,* dispone que "[l]as conclusiones de derecho serán revisables en todos sus aspectos por el tribunal". Aun así, se sustituirá el criterio de la agencia cuando no se pueda hallar fundamento racional que explique o justifique el dictamen administrativo. *Rolón Martínez v. Supte. Policía,* 201 DPR 26, 36-37 (2018)*.* Por ende, "los tribunales deben darle peso y deferencia a las interpretaciones que la agencia realice de aquellas leyes particulares que administra". *Torres Rivera v. Policía de PR,* 196 DPR 606, 627 (2016). Lo anterior responde a la vasta experiencia y conocimiento especializado que tienen las agencias sobre los asuntos que le son encomendados. *González Segarra et al. v. CFSE,* 188 DPR 252, 276 (2013).

Al revisar las decisiones de las agencias, el criterio rector que debe guiar a los tribunales es la razonabilidad de la actuación, aunque ésta no tiene que ser la única o la más razonable. *Vargas Serrano v. Inst. Correccional,* 198 DPR 230, 237 (2017). Por lo tanto, al momento de examinar un dictamen administrativo se determina que: (1) la decisión administrativa no está basada en evidencia sustancial; (2) la agencia erró en la aplicación de la ley (3) el organismo administrativo actuó de manera irrazonable, arbitraria o ilegalmente; o (4) su actuación lesiona derechos constitucionales fundamentales, entonces la deferencia hacia los procedimientos administrativos cede. *Empresas Ferrer v. ARPe, supra,* pág. 264.

En esta tarea, los foros judiciales analizarán los aspectos siguientes: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial, y (3) si las conclusiones de derecho fueron correctas. *Asoc. Fcias v. Caribe Specially et al. II,* 179 DPR 923, 940 (2010). Mientras que, las determinaciones de hecho se deben sostener si las mismas se basan en evidencia sustancial

que surja de la totalidad del expediente administrativo, *Rolón Martínez v. Supte. Policía,* 201 DPR 26, 36 (2018), las determinaciones de derecho pueden ser revisadas en su totalidad. *Torres Rivera v. Policía* de PR, *supra,* pág. 627.

Si bien es cierto que la revisión judicial no equivale a la sustitución automática del criterio e interpretación del organismo administrativo, *Rebollo v.* Y *Motors,* 161 DPR 69, 77 (2004), los tribunales revisores descartarán el criterio de los entes administrativos cuando "no se pueda hallar fundamento racional que explique o justifique el dictamen administrativo". *Rolón Martínez v. Supte. Policía, supra.* Si la interpretación y la aplicación del derecho no es correcta, el foro apelativo está obligado a intervenir. *JP, Plaza Santa Isabel v. Cordero Badillo,* 177 DPR 177, 187 (2009). "En esas circunstancias, [el foro apelativo] cederá la deferencia que merecen las agencias en las aplicaciones e interpretaciones de las leyes y los reglamentos que administra". *Super Asphalt Pavement, Corp. v. AFI y otros, supra.* Véase, además, *Capote Rivera y otros v. Voilí Voilá Corp. y otros, supra; Rolón Martínez v. Supte. Policía, supra.*

## B. Oficina para la Reglamentación de la Industria Lechera de Puerto Rico

La Ley Núm. 34 del 11 de junio de 1957, según enmendada, (5 LPRA sec. 1092 *et seq.*) (Ley Núm. 34-1957), conocida como la Ley para Reglamentar la Industria Lechera se creó con el propósito de establecer un organismo regulador de las relaciones existentes dentro de la industria lechera, así como de establecer las bases definitivas para el desarrollo y la estabilidad de esta. Asimismo, tiene el fin de buscar la forma de distribuir y mercadear de forma eficiente el producto principal y sus derivados. Exposición de Motivos de la Ley Núm. 34-1957, *supra.*

Consecuentemente, la Ley Núm. 34-1957, *supra*, creó la ORIL. Así, al Administrador de la ORIL se le otorgó el poder de reglamentación para solucionar de forma adecuada las situaciones que se puedan presentar en la industria lechera. Exposición de Motivos de la Ley Núm. 34-1957, *supra*. Las facultades del Administrador de la ORIL surgen del Artículo 5 de la Ley Núm. 34-1957 (5 LPRA sec. 1096. Respecto a los poderes generales, el Administrador de la ORIL tendrá el poder para investigar y reglamentar todas las fases de la industria de la leche y los productos derivados de esta, incluyendo la producción, elaboración, esterilización, manufactura, almacenaje, compra y venta, transportación y distribución del producto principal y sus derivados. Artículo 5 (a) de la Ley Núm. 34-1957, *supra*. Además, el Administrador está facultado para desarrollar y mantener condiciones satisfactorias de mercadeo tendientes a proteger la producción y distribución de la leche y los productos derivados de esta. Artículo 5 (b) (3) de la Ley Núm. 34-1957, *supra*. Asimismo, el Administrador de la ORIL podrá establecer normas de elaboración, esterilización, clasificación, empaque, envase, enlatado, rotulación, calidad y presentación de la leche y de sus productos derivados. Artículo 5 (b) (5) de la Ley Núm. 34-1957, *supra*.

De conformidad con las facultades concedidas por la Ley Núm. 34-1957, *supra*, el Administrador de la ORIL aprobó el Reglamento Núm. 4565 del 30 de octubre de 1991, según enmendado, conocido como el Reglamento Núm. 5 de la Oficina de Reglamentación de la Industria Lechera para Establecer las Normas que Regirán la Calidad de la Leche en Todas sus Fases de Producción, Elaboración y Venta y para Derogar el Regl. Núm. 3 Aprobado Sobre el Mismo Particular el 14 de septiembre de 1985

(Reglamento Núm. 5).[1] El Reglamento Núm. 5 de la ORIL pauta las normas que rigen la calidad y los aspectos sanitarios de la leche en todas las fases de producción, elaboración y venta. Sección 3 del Reglamento Núm. 5 de la ORIL.

Con relación a la controversia que nos atañe, la Sección 6 del Reglamento Núm. 5 dispone, entre otras cosas, que:

> [e]l conjunto de propiedades que determinarán la calidad de la leche fresca que se produzca, elabore o se venda en Puerto Rico, serán los establecidos en este Reglamento y en el Reglamento Sanitario Núm. 138 y la Ley Núm. 77 de Adulteración de Leche del 13 de agosto de 1957, del Departamento de Salud.
>
> A continuación se menciona aquel conjunto de propiedades más significativas, que se analizarán para determinar la calidad del producto:
>
> A- Leche cruda:
>
> [...]
>
> 8) Límite Bacteriano – La leche cruda de cada vaquería en particular no excederá de 100,000 colonias por mililitro al momento de la aprobación de este reglamento. Es la política pública de la Oficina de Reglamentación de la Industria Lechera lograr que la leche cruda de cada vaquería en particular no exceda setenta mil (70,000) colonias por mililitro. Para ello, se establece una reducción paulatina a razón de diez mil (10,000) colonias por mililitro anualmente a partir de la aprobación de este reglamento hasta lograr la reducción. El requisito de conteo bacteriano se establece como sigue: al 1 de enero del 2018 sea de 90,000 colonias por mililitro, al 1 de enero de 2019 sea de 80,000 colonias por mililitro y al 1 de enero de 2020 sea de 70,000 por mililitro. La leche cruda mezclada no excederá de trescientos mil (300,000) colonias por mililitro.

Cónsono con lo anterior, la Sección 6 (H) del Reglamento Núm. 5 de la ORIL establece que:

> H. Leche cruda, leche pasteurizada, ultrapasteurizada, aséptica y productos de leche no aptos para el consumo humano:
>
> Toda leche y productos de leche que en su examen químico, bacteriológico o físico demuestren las condiciones señaladas a continuación se consideraran impropios para el consumo humano y de estimarse necesario, contra los mismos se emitirá una orden de detención hasta tanto se confirme el resultado. En dichos casos de confirmarse la condición, estos serán decomisados. De no requerir confirmación se decomisarán inmediatamente. Estos son:

---

[1] El Reglamento Núm. 5 de la ORIL fue enmendado por el Reglamento Núm. 8889 del 29 de diciembre de 2016. El Reglamento Núm. 8889 fue efectivo el 27 de enero de 2017 y era el Reglamento vigente a la fecha de los hechos del caso que nos ocupa.

1) Contienen antibióticos o cualquier substancia inhibidora, en exceso de la tolerancia establecida por este Reglamento.

2) Contienen cualquier substancia venenosa o deletérea o extraña a la leche o productos de leche, que lo hagan perjudicial a la salud pública.

3) Contienen cualquier sustancia añadida no autorizada, que altere su volumen, peso, calidad o su composición normal.

4) Han sido producidos, transportados, almacenados, procesados, envasados, empacados o mantenidos bajo condiciones antihigiénicas.

5) Provienen de animales enfermos, extenuados, alimentados o tratados con productos contraindicados para animales lactantes.

6) Que contengan calostro, sangre, pus o excreta.

7) Inadecuadamente pasteurizados, ultrapasteurizados o asépticamente procesados.

8) Leche o productos de leche pasteurizados, ultrapasteurizados o asépticamente procesados que en el análisis de una sola muestra demuestren un recuento bacteriano y/o de coliformes total, en exceso de los límites permitidos.

9) Leche o productos de leche pasteurizados que resulten positivos a la prueba de fosfatasa.

10) Productos de leche elaborados con leche anormal, según definida.

11) Leche o productos de leche expuestos a la contaminación por el polvo, insectos, roedores, otras sabandijas, así como de cualquier otro contaminante.

12) Leche o productos de leche de procedencia clandestina.

13) Que provengan de goteo, sobrellenado o derrame de botellas, envases, tanques o cualquier otro equipo.

14) Leche o productos de leche devueltos por los consumidores y comerciantes a las plantas o centros de pasteurización o elaboración.

15) Leche y productos de leche asépticamente procesados cuyos envases estén aventados, con fecha de expiración vencida o que el análisis de una sola muestra demuestre crecimiento bacteriano.

16) Leche cruda pasteurizada, ultrapasteurizados o asépticamente procesada congelada.

17) Leche o productos de leche que muestren color, olor o sabor anormal.

18) Leche o productos de leche procedentes de establecimientos cubiertos por este Reglamento, a los cuales se les haya suspendido la licencia o el recogido de leche.

19) Leche o productos de leche aptos para el consumo humano mezclados con leche o productos de leche adulterados.

20) Leche o productos de leche que presenten cualquier otra condición que se considere peligrosa a la salud pública.

21) Leche y productos de leche cuya fecha de expiración este vencida.

22) Leche pasteurizada que se vaya a reprocesar y hayan transcurrido más de tres (3) días de haberse elaborado.

23) Leche pasteurizada que se haya reprocesado con leche que salió de las facilidades de la Planta Elaboradora.

24) Leche cruda, pasteurizada o ultra-pasteurizada que no cumpla con los requisitos de refrigeración establecidos en este reglamento.

25) Leche y productos de leche elaborados sin poseer licencia de ORIL.

26) Cualquier leche o producto de leche que por las circunstancias evaluadas, el Administrador entienda que no está apta para consumo humano.

A su vez, la Sección 7 del Reglamento Núm. 5 de la ORIL establece el procedimiento para determinar el cumplimiento con las normas de calidad bacteriológicas, químicas y de temperatura para leche cruda y pasteurizada y productos de leche pasteurizados. Específicamente, la Sección 7 establece, entre otras cosas, que:

A. Leche Cruda:

1) A Nivel de Finca

El Administrador, a través de sus representantes autorizados realizará muestreos de todas las vaquerías, con licencia de su Oficina, cuantas veces lo estimare necesario. Toda muestra se tomará y se lacrará en presencia del ganadero o alguna persona encargada y se le dejará una muestra sellada y lacrada al ganadero, identificada con la firma, signo, iniciales, número u otra identificación de la persona que tome la muestra. Disponiéndose, que, de no encontrarse el ganadero o persona encargada en el momento de tomar la muestra, esta se procederá a tomar obviándose la presencia del ganadero o su encargado. Estas muestras serán además de las muestras que puedan tomar los funcionarios de cualquier Agencia Reglamentadora.

Si la leche a ser inspeccionada o transportada se encuentra más fría de lo normal, el inspector y/o el transportador de leche cruda calentará(n) la leche previo a olerla. De igual manera, si hubiese olores a cloro, detergentes, pintura, alimentos u otros olores lo suficientemente fuertes, en el cuarto de heche o cerca de este, que impidan realizar la prueba de olor, no se recogerá o se inspeccionará la leche y se solicitará el recogido a condición, con cargo al ganadero.

Cuando dos (2) de las últimas cuatro (4) muestras consecutivas, tomadas en días distintos en una vaquería para conteo bacteriano, células somáticas o temperatura, no reunieran todos o algunos de los requisitos especificados en la Sección 6 de este Reglamento, el Administrador procederá a enviar un Inspector, quien le notificará por escrito con entrega personal, la condición encontrada al ganadero o persona encargada. Además, se procederá a tomar una muestra adicional después de tres (3) días de la notificación del Inspector, pero antes de que transcurran veintiún (21) días después de la muestra.

En caso de esta muestra resultar fuera de los requisitos señalados, se procederá a suspender el recogido de leche y se decomisará un mínimo de cuatro (4) ordeños. Se continuará el muestreo diario y se reanudará el recogido cuando dos muestras consecutivas estén de acuerdo al Reglamento. En caso que el recogido haya sido suspendido por dos (2) días o más, bastará que una muestra cumpla con el Reglamento para reanudarlo. En todo momento que se tome una muestra, se le dejará otra muestra lacrada al productor de leche.

En caso de que una muestra resulte con sustancias inhibidoras, adulterantes o que no cumpla con el requisito de crioscopía, se procederá a notificar al ganadero, a suspender el recogido de leche de inmediato y a decomisar por lo menos dos (2) ordeños. Se hará un muestreo diario de la vaquería, reinstalándose el recogido tan pronto una (1) muestra este dentro de las normas. En los casos donde la muestra exceda el límite de cloruro y a su vez presente cualquier nivel de lactosa, sólidos totales, grasa, proteínas y crioscopia fuera de la norma que presenta el historial químico el hato del ganadero, se creará una presunción de adulteración en la leche y será investigado como tal. Por esto, se ordenará una suspensión de recogido por tiempo indefinido y se iniciará un proceso de suspensión temporera de la licencia de la ORIL. Toda la leche que se produzca durante la suspensión del recogido y el proceso de suspensión de la licencia, será decomisada y corresponderá al ganadero cubrir los costos asociados a esta. Sin embargo, un resultado de cloruro fuera de norma, pero con resultados en los niveles de lactosa, sólidos totales, grasa, proteínas y crioscopía cónsonos con su historial químico, conllevará el inicio de una investigación exhaustiva en el hato. Durante todo el tiempo que dure tal investigación, toda la leche se recogerá a condición y le corresponderá al ganadero cubrir los costos de transporte y decomiso de la leche, de esta no cumplir con los parámetros de calidad.

[…]

2) A Nivel de Recogido

Toda planta o centro de pasteurización o elaboración que tenga duda de la calidad de la leche recibida en cualquiera de sus rutas de recogido enviará el tanque termo de leche al Laboratorio de la ORIL para análisis. De estar dicha leche fuera de los requisitos de calidad, cuya violación conlleve decomiso según establecidos en este reglamento, esta se decomisará. Además, se tomarán muestras periódicas de los tanques termo en tránsito de la finca a la planta o centro de pasteurización o elaboración y en la misma. Aquellos casos en los que la muestra determine una violación a los parámetros que conlleve decomiso, y por tanto haya que decomisar el contenido del camión termo, se identificará el o los ganaderos responsables de la condición. Se iniciará un muestreo en la vaquería y en caso de ser necesario se le aplicarán los procedimientos establecidos en esta sección.

En el caso que cualquier ganadero cause decomiso de leche de un tanque termo por estar la leche cruda contaminada con antibiótico, drogas, inhibidores u otros adulterantes, crioscopia o por exceder el límite de acidez de titulable vendrá obligado a pagar el costo de disposición y el volumen de la leche dañada decomisada.

Esta sanción se impondrá cuando se haya corroborado que la leche recogida a dicho ganadero fue la causante de la contaminación de la restante leche en el camión. La corroboración se realizará mediante el análisis de una muestra oficial, tomada por esta Oficina, por cualquier Agencia Reglamentadora o por una muestra del transportador de leche. Siempre que se tome una muestra para un análisis de laboratorio, se dejará una muestra de corroboración sellada y lacrada para que el ganadero constate el hecho relativo a la condición de su leche producida en esta ocasión. En el caso de los transportadores de leche, toda muestra que tome será lacrada. Si se

determinará que la leche que causó la contaminación del camión de recogido proviene de dos o más ganaderos, estos pagarán la totalidad de la leche dañada en proporción a la cantidad de leche aportada al volumen del camión. En caso de que el contenido de leche en un camión de recogido salga contaminado con antibiótico, inhibidores u otros adulterantes, tenga niveles de crioscopia y acidez titulable fuera de norma y ninguna de las muestras de leche de los ganaderos resulte contaminada, será responsabilidad de la planta asumir los costos del decomiso de leche. El transportador de leche que haya realizado la ruta, se le suspenderá la licencia y se iniciará un procedimiento administrativo con la intención de revocarle la misma.

[...].

## C. El Derecho Administrativo y la delegación de poderes a las agencias administrativas

Según establece nuestro ordenamiento jurídico, el Derecho Administrativo regula los trámites, los poderes y las responsabilidades de las agencias administrativas, las exigencias legales para efectuar tales acciones y los remedios que tienen disponibles las partes afectadas por la actuación de una agencia. *R & B Power v. Junta de Subastas*, 2024 TSPR 24, 213 DPR __ (2024); *Autoridad de Carreteras v. Programa de Solidaridad UTIER*, 210 DPR 897 (2022). Así pues, la medula de esta materia jurídica se basa en el proceder de las agencias que están adscritas al Poder Ejecutivo. *R & B Power v. Junta de Subastas, supra.* Así, el entendido es que la Asamblea Legislativa prescribe una norma de carácter general y esta es complementada por la intervención de la agencia administrativa, que, con su expertise, detalla la legislación aprobada. Íd.

Consecuentemente, es la Asamblea Legislativa el Poder Constitucional llamado a darle vitalidad a este andamiaje. *R & B Power v. Junta de Subastas, supra.* En ese sentido, el Artículo III de la Sección 16 de la Constitución de Puerto Rico concede a la Asamblea Legislativa la facultad de crear, consolidad o reorganizar departamentos ejecutivos y definir sus funciones. Art. III, Sec. 16, ELA, LPRA, Tomo I. De esta forma, tradicionalmente, la Asamblea Legislativa ha delegado a las agencias administrativas adscritas al

Poder Ejecutivo una serie de facultades, ya sea a través de la ley orgánica de la agencia o a través de leyes especiales. *R & B Power v. Junta de Subastas, supra; Fideicomiso de Conservación de Puerto Rico y Para la Naturaleza, Inc. v. ELA*, 211 DPR 251 (2023).

Así pues, dentro de ese marco de delegación, las agencias administrativas gozan de dos poderes esenciales: el poder de reglamentar al ejercer funciones cuasi-legislativas y el poder de adjudicar controversias al ejercer funciones cuasi-judiciales dentro de la pericia de la agencia. *R & B Power v. Junta de Subastas, supra; Caribe Comms., Inc. v. PRTC,* 157 DPR 203 (2002). A esos efectos, les corresponde a los organismos administrativos adherirse estrictamente a los poderes que les han sido delegados. *R & B Power v. Junta de Subastas, supra; Fideicomiso de Conservación de Puerto Rico y Para la Naturaleza, Inc. v. ELA, supra.* Por lo tanto, cuando se delega una función especifica a una agencia, esta no puede excederse de los límites establecidos expresa o implícitamente en la ley o por clara implicación de esta. *R & B Power v. Junta de Subastas, supra.*

De igual forma, los tribunales no podemos expandir el ámbito de acción que estableció el legislador. *R & B Power v. Junta de Subastas, supra,* citando a *Yiyi Motors, Inc. v. ELA,* 177 DPR 230 (2009). Asimismo, las actuaciones administrativas deben ajustarse al poder delegado y en ausencia de un mandato legislativo expreso o implícito, aquella actuación administrativa que no obedezca el poder conferido sería una actuación *ultra vires* de la agencia y, por ende, nula. *R & B Power v. Junta de Subastas, supra.* Véase, además, *Fideicomiso de Conservación de Puerto Rico y Para la Naturaleza, Inc. v. ELA, supra; Raimundi v. Productora,* 162 DPR 215 (2004).

**D. Procedimiento de reglamentación**

En nuestro ordenamiento jurídico, las agencias administrativas gozan del poder cuasilegislativo de aprobar reglas y reglamentos. *Sierra Club v. Junta de Planificación*, 203 DPR 596 (2019). En esa encomienda, las agencias administrativas pueden formular reglas no legislativas y reglas legislativas. Íd. Las reglas no legislativas constituyen pronunciamientos administrativos que no alteran los derechos ni las obligaciones de los individuos. Íd. Véase, además, *Mun. de Toa Baja v. D.R.N.A.*, 185 DPR 684 (2012). Por lo cual, la LPAU dispensa del procedimiento formal de la reglamentación en esos casos. *Sierra Club v. Junta de Planificación, supra.*

Las reglas no legislativas pueden clasificar en tres grupos: (1) reglas procesales; (2) declaraciones interpretativas; y, (3) declaraciones de política general. *R & B Power v. Junta de Subastas, supra,* citando a H. Meléndez Juarbe, Derecho Administrativo, 73 REV. JUR. UPR 509, 510 (2004). En consecuencia, de trata de cartas circulares, cartas normativas, directrices, memorandos y demás documentos menos formales que emiten las agencias para darle uniformidad a sus procedimientos internos, pautar su discreción o interpretar las leyes que administran. *R & B Power v. Junta de Subastas, supra.*

Por otra parte, una regla legislativa crea derechos, impone obligaciones y establece un patrón de conducta que tiene fuerza de ley. *Sierra Club v. Junta de Planificación, supra; Mun. de San Juan v. J.C.A.,* 152 DPR 673 (2000). Así pues, la Asamblea Legislativa ha sido consecuente y clara al disponer de un procedimiento específico para la aprobación, revocación y enmienda de las reglas legislativas. *Sierra Club v. Junta de Planificación, supra.* Esto, pues "la importancia que reviste este tipo de regla o reglamento, y el efecto que puede acarrear para el público en general [...] requiere el

cumplimiento del procedimiento de reglamentación según se establece en la LPAU". Íd., citando a *Asociación Maestros v. Comisión,* 159 DPR 81 (2003).

Por consiguiente, la LPAU exige que las agencias administrativas cumplan con determinados requisitos al "aprobar, enmendar o derogar una regla o reglamento". Sección 2.1 de la LPAU (3 LPRA sec. 9611). A esos efectos, todo procedimiento de reglamentación debe cumplir con cuatro requisitos básicos: (1) notificar al público la reglamentación que se aprobará; (2) proveer oportunidad para la participación ciudadana, que incluya vistas públicas cuando sea necesario u obligatorio; (3) presentar la reglamentación ante el Departamento de Estado para la aprobación correspondiente, y (4) publicar la reglamentación aprobada. Sección 2.1, 2.2, 2.3, 2.8 y 2.11 de la LPAU (3 LPRA secs. 9611-9613, 9618 y 9621).

En reiteradas ocasiones nuestro máximo Foro ha dispuesto que, todos estos constituyen requisitos imprescindibles y de ineludible cumplimiento. *Sierra Club v. Junta de Planificación, supra.* El cumplimiento de ese proceso es indispensable para poder reconocerle fuerza de ley a la regla promulgada, ya que ello forma parte de las garantías procesales que permean todo el estatuto. Íd., citando a *Centro Unido Detallistas v. Com. Serv. Pub.*, 174 DPR 174 (2008). Por lo tanto, será nulo todo reglamento que se adopte en violación a las disposiciones de la LPAU. *R & B Power v. Junta de Subastas, supra.*

Asimismo, la mera clasificación de un reglamento como legislativo o interno no es determinante. *R & B Power v. Junta de Subastas, supra; Báez Díaz v. ELA,* 179 DPR 605 (2010). Para determinar si una regla o un reglamento es legislativo o interno se utiliza el examen del impacto sustancial. *R & B Power v. Junta de*

*Subastas, supra.* Si la reglamentación modifica derechos sustantivos o crea obligaciones estamos ante un reglamento legislativo. Íd.

**III.**

Por estar los señalamientos de error íntimamente relacionados, discutiremos los cuatro (4) señalamientos de error de forma conjunta. *Veamos.*

En su recurso, Díaz González planteó que erró la ORIL al declarar *Ha Lugar* la *Moción de Desestimación* presentada por la ORIL y, en consecuencia, desestimar la *Querella,* ya que la ORIL incumplió con el debido proceso de ley cuando no aplicó correctamente las disposiciones del Reglamento Núm. 8889 del 27 de enero de 2017. Sostuvo que es arbitraria y caprichosa la decisión de ORIL en la *Querella,* fundamentada en la *Resolución y Orden Final* del 6 de junio de 2024, donde ORIL aplicó una disposición reglamentación sobre "adulterantes e inhibidores en la leche cruda" por analogía a la situación de la *Querella* que versa sobre bacterias y límite celular somáticas, lo anterior cuando el Reglamento Núm. 8889 del 27 de enero de 2017 contiene penalidades específicas para el caso de bacterias y límite de células somáticas.

Asimismo, señaló que erró la ORIL cuando aplicó las disposiciones sobre "adulterantes e inhibidores en la leche cruda" del Reglamento Núm. 8889 del 27 de enero de 2017 a hechos que versan sobre "conteo de bacterias y límite de células somáticas", aun cuando dicho reglamento ya contiene penalidades y procesos específicos para el caso de bacterias y límite de células somáticas, lo anterior creando una penalidad que no está contenida en el Reglamento Núm. 8889. Indicó, además, que erró la ORIL cuando creó una regla legislativa que crea una consecuencia punitiva por analogía, basada en una *"Notificación a los Productores de Leche Licenciados por la ORIL y Sujetos al reglamento Núm. 5 de la ORIL"*

la cual fue firmada y enviada por el director del Programa de Calidad de ORIL, quien no es administrador de ORIL, y ni siquiera es empleado de dicha agencia.

De una lectura detallada de la *Resolución y Orden Final* emitida por la ORIL, podemos colegir que la ORIL aplicó a la controversia ante su consideración la *"Notificación a los Productores de Leche Licenciados por la ORIL y Sujetos al reglamento Núm. 5 de la ORIL"* (*Notificación*). Dicha *Notificación*, fue firmada y enviada por el director del Programa de Calidad de ORIL, quien no es el Administrador de ORIL. Al evaluar puntillosamente la *Notificación* en cuestión, podemos concluir, según el derecho que antecede, que esta es una regla legislativa. Esto, pues crea derechos, impone obligaciones y establece un patrón de conducta que tiene fuerza de ley. *Sierra Club v. Junta de Planificación, supra.*

Es decir, la *Notificación*, que no fue emitida propiamente por el Administrador de ORIL, les notificó a los Productores de Leche que el incumplimiento con los parámetros de células somáticas y bacterias en la leche recogida en las vaquerías y cuya mezcla con la leche producida por otras vaquerías de dicha ruta de recogido, causen el incumplimiento de los parámetros de calidad del termo o compartimiento por uno o ambos parámetros (mayor a 750,000 escc/ml en células somáticas y/o mayor a 300,000 col/mi en el conteo bacteriano), se procedería al análisis de las muestras individuales para determinar quien fue el productor que causo la violación. Además, la *Notificación* dispone que aquel o aquellos ganaderos cuya muestra estuvo fuera del parámetro, tendrán que pagar el valor total de dicha leche decomisada. A todas luces, esta *Notificación* es una regla legislativa que debió seguir el procedimiento de reglamentación según se establece en la LPAU,

pues tiene fuerza de ley que afecta los derechos de los Productores de Leche.

Al revisar el Reglamento Núm. 5, hemos constatado que la disposición incluida en la *Notificación* no está contenida en dicho reglamento. Por lo tanto, podemos inferir que se intentó enmendar el Reglamento Núm. 5 a través de la *Notificación* y sin seguir el procedimiento establecido en la LPAU. Esto, aun cuando la misma *Notificación* reconoce la existencia del Reglamento Núm. 5 que regula los hechos que pretende modificar la *Notificación* y que el Reglamento Núm. 5 no provee la sanción que se pretende imponer mediante la *Notificación.* Por lo tanto, la actuación de la ORIL de poner en vigor una *Notificación* emitida por un funcionario que no es el Administrador de ORIL y sin seguir el procedimiento establecido en nuestro ordenamiento jurídico, es una *ultra vires* y, en consecuencia, nula.

De otro lado, de la *Resolución y Orden Final* surge que la ORIL aplicó por analogía las reglas sobre leche contaminada con adulterantes, antibióticos, drogas e inhibidores aun cuando la leche cruda perteneciente al recurrido presuntamente incumplía con un parámetro de bacterias. De una lectura de la *Orden RE: Cobro por Contaminación de Leche en Tanque Termo* emitida por la ORIL en contra de Díaz González, no surge cual fue el conteo bacteriano que arrojó la producción de leche que estaba fuera de las normas establecidas; por lo cual, la notificación de la violación no fue adecuada.

Asimismo, aun en el supuesto que el conteo bacteriano fuese mayor a 100,000 colonias por mililitro, la ORIL debió aplicar la Sección 7 del Reglamento Núm. 5 que establece el procedimiento para determinar el cumplimiento con las normas de calidad bacteriológicas, químicas y de temperatura para la leche cruda. Específicamente, debió aplicar la Sección 7 (A) (1) a nivel de finca.

Dicha sección atiende el incumplimiento con un parámetro bacteriano, en lugar de aplicar la Sección 7 (A) (2) a nivel de recogido que únicamente trata el decomiso de leche cruda con antibiótico, drogas, inhibidores u otros adulterantes, crioscopia o por exceder el límite de acidez; que no es el caso ante *nos*.

En conclusión, incidió la ORIL al emitir una *Resolución y Orden Final* mediante la cual aplicó una *Notificación* que tiene el efecto de una regla legislativa. Como tal, su aprobación tenía que seguir el procedimiento reglamentario que ordena la LPAU, lo que no ocurrió. Al director del Programa de Calidad de ORIL promulgar la *Notificación*, cuyo efecto es uno legislativo, y antes de su aplicación, la ORIL debió cumplir con los cuatro (4) requisitos básicos dispuestos en la LPAU para aprobar, enmendar o derogar un reglamento.

Además, incidió la ORIL al aplicar por analogía una disposición reglamentaria aun cuando había una disposición reglamentaria que atendía la situación. Así pues, la actuación de la ORIL fue arbitraria y caprichosa. Si bien es cierto que los tribunales apelativos debemos otorgar amplia deferencia a las decisiones emitidas por las agencias administrativas, debido a que estas cuentan con un criterio especializado, ello no significa que no intervendremos cuando se presente un claro abuso de discreción.

Por lo tanto, procede que se revoque y se deje sin efecto la *Resolución y Orden Final* emitida por la ORIL el 5 de junio de 2024.

**III.**

Por los fundamentos antes expuestos, *revocamos* el dictamen recurrido.

　　　　Lo acordó y manda el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.

　　　　La Jueza Álvarez Esnard concurre sin voto escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones